**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1185

TIFFANY ADELE KING, as Administratrix of the Estate of Maurice Antoine King,

   Plaintiff – Appellee,

  v.

CHARLES S. BLACKWOOD, in his official capacity as Sheriff of Orange County; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, official bond for Defendant Sheriff Blackwood; WILLIAM D. BERRY, JR., in his individual capacity; THOMAS E. LINSTER, III,

   Defendants – Appellants,

  and

ORANGE COUNTY; WILMER A. GOMEZ, in his individual capacity; STEFAN H. HOOKER, in his individual capacity; KENDRICK R. MOORE, in his individual capacity; ANTONIO R. CARTNAIL, in his individual capacity; ANGELA K. SPEAR, in her individual capacity; JERRY R. HAWKINS, in his individual capacity; JAMISON R. SYKES, in his individual capacity,

   Defendants.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Catherine C. Eagles, Chief District Judge. (1:21-cv-00383-CCE-JEP)

Argued: December 10, 2025        Decided: July 2, 2026

Before AGEE, RICHARDSON, and BENJAMIN, Circuit Judges.

Affirmed in part and dismissed in part by published opinion.  Judge Richardson wrote the opinion, in which Judges Agee and Benjamin joined.

―――――――

Sonny Sade Haynes, Winston-Salem, North Carolina, Brian Florencio Castro, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellants.  Liedeke Allyn Sharp, ALLYN SHARP LAW, PLLC, Carrboro, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

Two detention officers heard an inmate, Maurice Antoine King, moaning in his cell and suspected he had been beaten. Then, to avoid extra paperwork, they waited twenty minutes before checking on him. Several other inmates had assaulted King in his cell, and he ultimately died as a result. His estate sued the County, the Sheriff, and several detention officers and supervisors, alleging that Defendants allowed King to be beaten and failed to help him.

The district court denied two of the officers' motion for summary judgment on qualified immunity grounds. We affirm. Taking the evidence in the light most favorable to King, the district court found that the officers suspected an assault, heard sounds of distress, and delayed responding to avoid paperwork. Accepting those findings, we agree that a reasonable jury could find the officers consciously disregarded a substantial risk of serious harm. And we agree that such disregard would violate clearly established law.

## I.    BACKGROUND

### A.    King's Assault And Death

After pleading guilty to federal drug charges, Maurice King was housed in the B-Pod[1] of the Orange County Detention Center as he awaited sentencing. Each cell door bore a rectangular window. Doors were locked at night but stayed unlocked during the day. Cameras watched the common areas and cell entrances but could not see inside the cells.

---

[1] B-Pod is a segregation block, kept apart from the general population.

3

And a two-way intercom ran into every cell. Jailhouse policy required officers to periodically inspect inmates visually.

At 6:38 p.m. on March 4, 2020, video surveillance shows King leading another inmate, Grantz, upstairs to his second-floor cell and Grantz closing the cell door behind them. Within a minute, video shows two other inmates—Salters and Stephens—entering the cell and the cell door opening to reveal a physical altercation at the cell's threshold. Another inmate, Bradford, then entered the cell and closed the door. Then, Bradford, Salters, and Stephens left the cell. A few minutes later, at 6:45 p.m., Grantz left the cell and Bradford closed the door, so only King remained inside.

Two minutes later, Officer Berry entered B-Pod to conduct his round. He passed King's cell twice, but he never turned his head toward the cell. Officer Berry later claimed he used his "peripheral vision" to look through the cell window. J.A. 1521 n.7. Thirty minutes after Officer Berry finished his round, Officer Linster came in for the next round at 7:19 p.m. He too walked past King's cell twice without looking inside. Officer Linster later claimed he had seen King and Grantz sitting on different bunks in King's cell. But the cell had only one bunk, and the video showed that Grantz had already left King's cell at 6:45 p.m.

Between 7:20 and 7:47 p.m., inmates Bradford, Grantz, Stephens, and Salters cycled in and out of King's cell. At 7:34 p.m., an inmate pulled a towel that had partially covered the cell-door window over the rest of the window to fully block it.

4

At 7:47 p.m., Officer Linster returned for another round. He passed King's cell yet again without looking inside. On his way out, he heard a "concerning noise" from the cell.[2] But he kept walking.

Three minutes later, at 7:50 p.m., Officers Berry and Linster used the intercom to listen in on King's cell. Berry later told investigators that they thought they heard "a moan or a groan." J.A. 1523 n.9. Elsewhere, Berry said he heard "someone talking" to King as they listened through the intercom.

After this, the pair waited roughly twenty-three minutes. Officer Berry did not go to check on King until 8:13 p.m. He explained the delay to investigators: "[W]e had to wait until about five minutes after [8 p.m.] or our punch won't count." J.A. 922. A "punch" is the touch of a wall sensor that the Detention Center uses to log supervisory rounds. The sensors had to be hit on schedule. A missed punch meant extra paperwork, as Officer Berry explained in his deposition: "[I]f you go in 1 minute early you got to fill out that damn paper . . . at 5 o'clock in the morning before you go home that you missed a punch." J.A. 922–23. Berry had heard the noise. He waited anyway. He did not want to do paperwork.

When speaking with investigators after the fact, both officers described their thoughts during the incident. Both men indicated that after hearing the sounds from King's cell—and before checking on him—they suspected that King had been assaulted. *King v. Blackwood*, No. 1:21-CV-383, 2025 WL 487233, at *3 (M.D.N.C. Feb. 13, 2025). Officer

---

[2] Officer Linster also claimed he thought this noise was "someone ask[ing] for soap." J.A. 811, 1302–04. But Lieutenant Spear, who supervised the officers, testified that Officer Linster told her that he had heard "labored breathing." J.A. 1457, 1523 n.9.

5

Berry explained that when he finally entered King's cell, he was "looking for some kind of, like, injuries," because "somebody [could have] hit him in the face." *Id.* And Officer Linster recounted telling Berry, before the cell check, that he wanted "to be for sure" because "I don't want to accuse nobody of something they ain't done." *Id.*

Before entering King's cell, Officer Berry stopped at the nurse's station and picked up an inhaler—King was known to have asthma. But Berry would later tell a different story. In both his deposition and discussion with investigators, he said that he checked on King first and only then retrieved the inhaler at King's request. The surveillance footage shows the opposite. He had the inhaler before he ever opened the cell door.

Inside, Officer Berry found King soaking wet. The area above his left eye was bruised, bleeding, and swollen. He could not speak. He struggled to breathe. Berry radioed Officer Linster. Linster called Sergeant Cartnail, a supervisor. Bringing the nurse into B-Pod required locking down every inmate first, which would take about thirty minutes. So they brought King to the nurse instead. Lieutenant Spear later acknowledged that, in hindsight, the officers should have called 911.

At 8:56 p.m., officers wheeled King out of B-Pod to the on-site nurse. By 9:06 p.m., the nurse had called 911. EMS arrived at 9:13 p.m. At first, King insisted he was only having an asthma attack. But in the ambulance, he changed his story: "They" had "stomped him in the head" and "choked him out." J.A. 1526. He also identified the assailant as someone named "Grant." An EKG showed he had suffered a heart attack.

King died at Duke Hospital at 10:22 p.m. The cause: "hypertensive cardiovascular disease in the setting of a physical altercation." J.A. 821, 826. The death was classified a

6

homicide.  The attending physician and the local medical examiner agreed that King's

injuries might not have been fatal if he had received treatment sooner.

### B.      Procedural History

King's estate, administered by his mother, Ms. King, brought four claims:  (1) a

§ 1983 individual-capacity claim against eight detention officers and supervisors for

deliberate indifference to King's safety and medical needs; (2) a *Monell* municipal liability

claim against Orange County and Sheriff Blackwood; (3) a state-law wrongful death claim;

and (4) a state-law claim on Sheriff Blackwood's $250,000 official bond from Travelers

Casualty and Surety Company of America.

On summary judgment, the magistrate judge evaluated qualified immunity under

the subjective Eighth Amendment standard—the standard applicable to King in 2020,

when these events took place.[3]  The magistrate judge recommended dismissing the

---

[3] Pretrial detainees bring deliberate indifference claims under the Fourteenth Amendment, *see Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015), while convicted prisoners bring them under the Eighth Amendment, *see Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Before 2023, we assessed both types of claims under the same, subjective standard.  *See Mays v. Sprinkle*, 992 F.3d 295, 301–02 (4th Cir. 2021).  Then, in *Short v. Hartman*, this Court eliminated the subjective element for Fourteenth Amendment deliberate-indifference claims brought by pretrial detainees, adopting an objective-reasonableness test instead.  87 F.4th 593, 611 (4th Cir. 2023).

Both the magistrate judge and the district court correctly applied the pre-*Short* subjective standard, because the relevant events took place in 2020, before we decided *Short*.  Post-*Short*, whether detainees like King, convicted but awaiting sentencing, constitute pretrial detainees or convicted prisoners remains an open question in this Circuit.  But here, regardless of which category King falls into, the result is the same because the subjective standard still applied to both categories back in 2020.  *See Mays*, 992 F.3d at 301–02.

7

individual-capacity § 1983 claims but allowing the *Monell* claim and the bond-statute claim to proceed.

The district court adopted these recommendations with one important exception: It rejected the recommendation to grant summary judgment on the § 1983 individual-capacity claims. In a subsequent order, the court denied summary judgment to Officers Berry and Linster, concluding that a jury could find they "ignored obvious risks to Mr. King's health for over an hour" and "intentionally delayed checking on Mr. King for some twenty minutes in order to avoid extra paperwork . . . despite knowing that no one had looked into Mr. King's cell or monitored the video for well over an hour." *King*, 2025 WL 487233, at \*3, \*4. The court limited King's § 1983 claim to Officers Berry and Linster's conduct from the time of Berry's first failed cell check after the assault to Berry's entry into the cell.

Defendants Blackwood, Travelers, Berry, and Linster filed a timely notice of appeal.

## II. DISCUSSION

### A. Jurisdiction

We start with jurisdiction. *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 168 (4th Cir. 2024).

#### 1. We possess jurisdiction over the qualified immunity appeal

The denial of qualified immunity is immediately appealable under the collateral order doctrine to the extent it turns on a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Officers Berry and Linster challenge the district court's ruling insofar as it rests on the legal conclusion that the evidence, as found by the district court in the light

8

most favorable to King, reveals a violation of clearly established law.  That presents an appealable legal question.  *See Rambert v. City of Greenville*, 107 F.4th 388, 396 (4th Cir. 2024); *Winfield v. Bass*, 106 F.3d 525, 529–30 (4th Cir. 1997).  So we have jurisdiction over this appeal.

### 2.      We lack pendent jurisdiction over the *Monell* claim

Sheriff Blackwood also appeals the denial of summary judgment on King's *Monell* claim.  That order is not independently appealable.  So we may review it only if we have pendent appellate jurisdiction.   The Sheriff argues that we should exercise pendent jurisdiction because the *Monell* claim is "inextricably intertwined" with the properly appealable qualified immunity order.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995); *Bellotte v. Edwards*, 629 F.3d 415, 427 (4th Cir. 2011).

Sheriff Blackwood contends that the claims are inextricably intertwined because an agent's constitutional violation is a necessary predicate for *Monell* liability.  *See Atkinson v. Godfrey*, 100 F.4th 498, 509 (4th Cir. 2024) ("[A] municipality cannot be liable in the absence of a constitutional violation by one of its agents." (quoting *Altman v. City of High Point*, 330 F.3d 194, 207 n.10 (4th Cir. 2003))).  Thus, he argues, if we conclude on the qualified immunity appeal that Officers Berry and Linster committed no constitutional violation, then the *Monell* claim necessarily fails.  *See Evans v. Chalmers*, 703 F.3d 636, 654 n.11 (4th Cir. 2012).

9

We decline to exercise pendent jurisdiction because our resolution of qualified immunity for King's § 1983 claim does not necessarily resolve the *Monell* claim.[4]  *See Swint*, 514 U.S. at 51.  Specifically, the answer to the qualified-immunity question does not depend on whether the Fourteenth Amendment or the Eighth Amendment applied to King as a convicted-but-unsentenced inmate, while the resolution of the *Monell* claim does.

Qualified immunity "protects reasonable officers who try to comply with the law." *Harrold v. Hagen*, 174 F.4th 393, 407 (4th Cir. 2026) (Richardson, J., dissenting).  Indeed, the doctrine shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  So we conduct the inquiry based on the clearly established law at the time of the violation—an officer cannot be expected to know how the law might develop.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).  In 2020, when the events of this case occurred, a reasonable officer could have concluded that the subjective standard applied to a deliberate-indifference claim regardless of whether it was brought by a pretrial detainee, governed by the Fourteenth Amendment, or by a convicted prisoner, governed by the Eighth Amendment.  *See Mays*, 992 F.3d at 301–02 (explaining in 2021 that "a pretrial-detainee-medical-deliberate-indifference claim required both an objectively serious medical condition and subjective knowledge of the

---

[4] Pendent jurisdiction might be appropriate where resolution of the first prong of qualified immunity in Defendants' favor—*i.e.*, a finding of no constitutional violation—would necessarily defeat the *Monell* claim.  *See Evans*, 703 F.3d at 654 n.11; *Atkinson*, 100 F.4th at 509.  But that is not this case.  As we explain below, we do not find in Officers Berry and Linster's favor.  And the claim against them rests on a different factual theory than the *Monell* claim, which is premised on the Sheriff's alleged custom of failing to ensure visual inspections during rounds.

condition and the excessive risk posed from inaction"). In other words, for qualified immunity purposes, we need not resolve which amendment governs,[5] because from the perspective of a reasonable officer at the time, the subjective standard could have applied to both. *Id.*

Not so for the *Monell* claim. Because municipalities cannot assert qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 638 (1980), Ms. King simply must show that a custom or practice violated King's constitutional rights without the clearly established overlay. So we would base a *Monell* decision on the law as it *is* today, not the law as it *might seem* in the mind of a reasonable officer at the time of the relevant events. And today, in light of this Court's decision in *Short*, we use different standards depending on whether the claim arises under the Eighth or Fourteenth Amendment. *See* 87 F.4th at 611. Thus, unlike the § 1983 claim against Officers Berry and Linster, the outcome of the *Monell* claim could differ depending on which constitutional provision applies. *See Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 684 (4th Cir. 2023). So we could not resolve the claim without deciding which amendment governs convicted-but-unsentenced detainees. Therefore, the *Monell* claim is not necessarily resolved by our disposition of the qualified

---

[5] *Compare Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000) (holding that the Fourteenth Amendment applies until a sentence is imposed) *and Lewis v. Downey*, 581 F.3d 467, 473–74 (7th Cir. 2009) (same), *with Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) (holding that the Eighth Amendment applies after a conviction); *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957 (8th Cir. 1994) (same); *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (same); *and Tilmon v. Prator*, 368 F.3d 521, 523–24 (5th Cir. 2004) (same).

immunity appeal, and we dismiss the appeal of the *Monell* claim for lack of appellate jurisdiction.

**3.      We lack pendent jurisdiction over the state-law bond claim**

Sheriff Blackwood and Travelers Casualty and Surety Company also appeal the denial of summary judgment on King's claim under North Carolina's bond statute, N.C. Gen. Stat. § 58-76-5.  But to exercise pendent jurisdiction over the bond claim would be even further afield.  This claim requires only a showing of negligence.  *See Stafford v. Barker*, 502 S.E.2d 1, 6 (N.C. Ct. App. 1998).  But "[d]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835.  So even if we ruled in Defendants' favor on qualified immunity—finding that Officers Berry and Linster were not deliberately indifferent—that would not establish that the officers were not negligent.  Therefore, resolving the qualified immunity appeal has no necessary bearing on the bond claim.  *See Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 167 (4th Cir. 2023).  So we dismiss this portion of the appeal.

**B.      Officers Berry And Linster Are Not Entitled To Qualified Immunity At This Stage**

Qualified immunity shields government officials from civil liability unless a plaintiff shows both (1) that the official violated a constitutional right and (2) that the right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  And since interlocutory appeals of the denial of qualified immunity "are limited to legal questions," we do not second-guess the district court's factual findings as

12

we conduct our analysis. *Hicks v. Ferreyra*, 965 F.3d 302, 309 (4th Cir. 2020).[6]

Accordingly, we decide only whether, on those assumed facts and inferences, the officers

violated clearly established law.

### 1.      Officers Berry and Linster violated a constitutional right

For the reasons discussed above, we evaluate whether Officers Berry and Linster

violated a constitutional right, for qualified immunity purposes, by applying the subjective

deliberate-indifference standard.   This standard requires proof of both an objective

component—the deprivation must be "objectively serious"—and a subjective one—the

officer must have had "a sufficiently culpable state of mind." *Mays*, 992 F.3d at 300

(quoting *Farmer*, 511 U.S. at 834).  An objectively serious medical need is one "diagnosed

by a physician as mandating treatment" or one "so obvious that even a lay person would

easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241

(4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  The

---

[6] The scope of our interlocutory review is limited, extending only to "abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 317 (1995).  It does not extend to challenges to a district court's determination of "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319–20.  Therefore, we "take, as given, the facts that the district court assumed when it denied summary judgment," *id.* at 319, and decide only whether, on those facts, the officers violated clearly established law.  That said, "we are [not] strictly confined to the four corners of the district court's order" as we conduct our review. *Williams v. Strickland*, 917 F.3d 763, 768 n.3 (4th Cir. 2019).  When the district court does not explicitly state a fact, "we may assume some facts . . . provided that we draw all inferences in the plaintiff's favor." *Id.*; *see also Thurston v. Frye*, 99 F.4th 665, 675 n.9 (4th Cir. 2024).  So when conducting interlocutory review of the denial of qualified immunity, we must accept the facts "as the district court gives them to us, . . . view those facts in the light most favorable to the plaintiff," and ask whether "the defendant officers [are] still entitled to qualified immunity." *Hicks*, 965 F.3d at 309 (quoting *Williams*, 917 F.3d at 768) (cleaned up).

subjective prong requires that the officer actually knew of a substantial risk of serious harm and consciously disregarded that risk. *Farmer*, 511 U.S. at 837.

That background frames the core of King's claim: Officers Berry and Linster's conduct during the roughly twenty minutes between 7:50 p.m., when they first heard sounds of distress from King's cell, and 8:13 p.m., when Berry finally opened the cell door.[7]

Here, the objective component is satisfied. This inquiry is keyed to King's medical situation as known by the officers at the time of the alleged indifference, *not* to whatever injuries were revealed afterward. So the relevant medical need is not the hematoma that the officers eventually discovered or the cardiac event diagnosed at the hospital. Rather, it is the situation that the officers confronted around 7:50 p.m. The district court characterized the situation as follows: Officers Berry and Linster were stationed at a segregation pod known to house violent inmates, presenting "a high risk of inmate-on-inmate violence," *King*, 2025 WL 487233, at *2; during one of his rounds, Officer Linster heard a "concerning sound" come from an inmate's cell, and reported this to Officer Berry; soon thereafter, they heard—via the intercom—moaning, groaning, and labored breathing coming from the same cell. A reasonable lay person presented with those facts—a

---

[7] King's counsel contends that the district court improperly narrowed the surviving claim to exclude the Officers' response after discovering King's condition at 8:13 p.m. But King did not seek to cross-appeal the grant of summary judgment as to that period. *See Bellotte*, 629 F.3d at 427. Although an appellee may defend the judgment below on any ground supported by the record, he may not attack it to enlarge his rights absent a cross-appeal. *Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008); *Morley Constr. Co. v. Md. Cas. Co.*, 300 U.S. 185, 191 (1937); *see also El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999).

concerning sound followed by moans, groans, and labored breathing from an inmate in a highly violent unit—would have recognized the need for medical attention.[8] *See Iko*, 535 F.3d at 241.

King also satisfies the subjective prong. The district court evaluated the record, made a number of factual findings, and decided that based on these findings, a reasonable jury could conclude that Officers Berry and Linster actually knew of and consciously disregarded a substantial risk to King. *See Farmer*, 511 U.S. at 842. On interlocutory appeal, we do not review whether the record supports that assessment of the facts a reasonable jury could find and the inferences it could draw. Rather, accepting that assessment, we ask whether those facts and inferences would fulfill the legal standard: actual knowledge and conscious disregard of a substantial risk.

First, the district court found that the officers suspected that King had been assaulted. In interviews on the day after the attack, "both officers stated or at least implied

---

[8] Defendants resist this conclusion by relying on cases addressing whether asthma qualifies as a serious medical need. Appellants' Br. at 41–42 (citing *Sledge v. Kooi*, 564 F.3d 105 (2d Cir. 2009)). Reliance on such cases misconceives the question before us. For one, such an argument depends on a characterization of the situation not adopted by the district court. The district court did not find that Officers Berry and Linster suspected only an asthma attack; it found that the officers heard sounds of distress from an inmate in circumstances reasonably suggesting that the inmate had been the victim of a violent assault. The fact that these sounds might *also* have been consistent with an asthma attack does not detract from the objective seriousness of what the officers heard. That's because the inquiry here does not turn on whether one possible explanation for the sounds, standing alone, would qualify as a serious medical need. Instead, the objective prong asks whether a reasonable lay person would have recognized the need for medical care given the particular situation the officers faced: Here, that means considering whether alarming sounds from a cell in a violence-prone prison block indicate an objectively serious medical need, not whether King's asthma was in and of itself a serious medical condition.

15

that after they heard sounds coming from Mr. King's cell, they suspected he had been assaulted." *King*, 2025 WL 487233, at *3. Officer Berry told investigators that when he entered the cell, he "was looking for some kind of, like, injuries" in the event that "somebody [had] hit [King] in the face." *Id.* Officer Linster told investigators that before Berry checked King's cell, he said to Berry: "I want to be sure before, you know, . . . cause I don't want to accuse nobody of something they ain't done." *Id.* Whether a jury may draw that inference is not ours to decide in this interlocutory appeal. The district court *did* draw it; we must credit it. *See Johnson*, 515 U.S. at 319–20; *Hicks*, 965 F.3d at 309. But we *do review* whether such suspicion, along with the district court's other factual findings detailed below, would together permit a reasonable jury to conclude the officers actually knew of and consciously disregarded a substantial risk to King.

Second, the district court found that Berry and Linster "intentionally delayed checking on Mr. King for some twenty minutes in order to avoid extra paperwork." *King*, 2025 WL 487233, at *2. Officer Berry's deposition supplied the basis for this finding: "[W]e had to wait until about five minutes after [8 p.m.] or our punch won't count," and "[i]f you go in 1 minute early you got to fill out that damn paper the next morning . . . that you missed a punch." J.A. 922–23. From these statements, the district court factually concluded that the officers did not take action for twenty minutes, despite suspecting King had been assaulted, because they wanted to avoid an administrative inconvenience the next morning. And the court came to the legal conclusion, which we review, that from this factual conclusion, a reasonable jury could find conscious disregard of a substantial risk to King. *King*, 2025 WL 487233, at *4.

16

Third, the district court found that before Officer Berry finally went to King's cell, he stopped at the nurse's station and retrieved an inhaler. The court understood this conduct as "showing that he knew that medical care was needed." *King*, 2025 WL 487233, at *2.

Finally, the district court found that Officers Berry and Linster "both made inconsistent and arguably false material statements in their reports, interviews, depositions, and declarations, all tending to indicate they knew they had violated Mr. King's rights." *King*, 2025 WL 487233, at *3. Officer Berry told investigators multiple times that he had retrieved King's inhaler only after initially checking on him, but surveillance video shows he brought the inhaler on his first visit to King's cell. Officer Linster claimed he had seen King and Grantz sitting on separate bunks during his 7:19 p.m. round, but the cell had only one bunk, and video shows Grantz leaving the cell before that time. From these inconsistencies, the district court inferred the officers knew their response was inadequate—another fact from which a jury could conclude that the officers violated King's constitutional rights. *King*, 2025 WL 487233, at *3.

Taken together, the district court's factual findings—audible distress from an inmate suspected of having been assaulted, a twenty-minute delay motivated by paperwork avoidance, and post-incident statements supporting an inference of contemporaneous awareness—would permit a reasonable jury to find that Officers Berry and Linster subjectively appreciated a substantial risk of serious harm to King and consciously disregarded it. Again: Whether a jury could, much less would, draw the factual inferences that the district court did is not our judgment to make on interlocutory review. Where the

17

district court drew a factual inference, we must credit it. *See Johnson*, 515 U.S. at 319–20. We find the subjective prong is satisfied based on the facts as the district court found them.

Officers Berry and Linster's arguments to the contrary fail, because each depends on a characterization of the record that the district court did not adopt. First, they argue that they lacked actual knowledge of a substantial risk—that they believed King was experiencing, at most, an asthma attack, and that their delay perhaps reflects poor judgment, but not deliberate indifference to a known serious risk. And they contend that Officer Berry's retrieval of the inhaler confirms their good-faith belief that King was merely experiencing an asthma attack. *See Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022) ("[G]ood-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances.").

Whatever else the officers may have suspected, the district court found that they suspected King had been assaulted. *King*, 2025 WL 487233, at *2–*4. That finding controls here, and it is enough. The officers contend that Berry's retrieval of the inhaler shows they thought the trouble was asthma. But the court did not treat the inhaler as a benign diagnostic guess; it treated Berry's detour to fetch it—before he ever opened the door and saw King—as evidence he already "knew that medical care was needed." *King*, 2025 WL 487233, at *2. A suspicion of assault and a belief that asthma might be involved are not mutually exclusive, and the officers need not have settled on a diagnosis to be on notice of a substantial risk. *See Farmer*, 511 U.S. at 842. *Koon* protects officers who recognize a problem and take genuine, if imperfect, steps to meet it. 50 F.4th at 407. Here,

18

the district court found the opposite:  For twenty minutes these officers did nothing to spare themselves a form.

Next, the officers argue that their post-incident inconsistent statements are "just as consistent with a scenario where the officers did not realize the severity of the situation initially and, upon seeing the tragic result, attempted to justify their actions after the fact." Appellants' Reply Br. at 15.  That is a jury argument, not a summary-judgment argument. The district court—construing all reasonable inferences in King's favor—drew the contrary inference and made the factual determination that the officers' "inconsistent and arguably false statements" indicated "that they knew their response to Mr. King's medical need was inadequate."[9]  *King*, 2025 WL 487233, at *3.  We may not credit Defendants' preferred inference over the district court's on interlocutory review of a denial of qualified immunity.  *See Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579–80 (4th Cir. 2017).[10]

---

[9] The officers say their later misstatements show only after-the-fact embarrassment and that a plaintiff cannot reach a jury merely by inviting disbelief.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).  The premise fails on its own terms.  This is not a credibility contest in which King asks a jury to doubt the officers' word.  The surveillance video establishes the falsity directly:  Officer Berry had the inhaler before he initially entered the cell, though he swore he retrieved it afterward; Officer Linster says he saw two inmates on two bunks in a one-bunk cell after one of the inmates had already left.  The district court was entitled to infer from demonstrably false exculpatory accounts that the officers knew at the time their response was inadequate.

[10] The officers also point out that when EMTs finally attended to King, they found him "awake, alert, and oriented" with a level of distress classified as "mild."  J.A. 176–77. But King's apparent lucidity at 9:13 p.m. says nothing about what Berry and Linster knew or suspected at 7:50 p.m.

### 2.    The violated right was clearly established

Having concluded that the district court's findings would permit a reasonable jury to find that Officers Berry and Linster violated King's constitutional right to be free from deliberate indifference to a serious medical need, we turn to whether that right was clearly established at the time of their conduct.[11]   It was.

Our Circuit "require[s] less specificity when defining the right in the Eighth Amendment context than when the Fourth Amendment is implicated." *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023); *Pfaller v. Amonette*, 55 F.4th 436, 453 (4th Cir. 2022). Thus, in cases like the one before us, this Court has identified the applicable clearly established right as "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016); *see also Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022).  The governing principle here has been settled since the Supreme Court's decision in *Estelle v. Gamble*: When "prison guards . . . intentionally den[y] or delay[] access to medical care," they violate the Eighth Amendment.  429 U.S. 97, 104–05 (1976); *see Scinto*, 841 F.3d at 236.

The district court found that a jury could conclude that Officers Berry and Linster did precisely that.  After hearing sounds that made them suspect King had been assaulted, they intentionally delayed his access to medical care in order to avoid paperwork.  This

---

[11] Whether a "right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'" *Elder v. Holloway*, 510 U.S. 510, 516 (1994). That legal question is ours to decide, and it is distinct from the factual predicate, *i.e.*, what the officers knew and did.  As already explained, *the latter* question is for the jury, whose role we respect on interlocutory appeal by accepting the district court's view of what the record would permit the jury to find.

Court has repeatedly applied *Estelle* to deny qualified immunity in analogous circumstances. *See, e.g.*, *Scinto*, 841 F.3d at 232 (reversing grant of summary judgment based on qualified immunity where officials failed to provide treatment to an inmate "experiencing evident physical distress"); *Mays*, 992 F.3d at 305 (reversing dismissal based on qualified immunity where officers jailed an intoxicated inmate without providing medical care despite knowing that he had ingested large quantities of prescription drugs); *see also Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 106 (4th Cir. 1995) (explaining that courts should not treat an officer's "contrived obliviousness" to an obvious medical need as a lack of subjective awareness).

True, the cases just cited involved officers who already knew the nature of the medical conditions they confronted, whereas Officers Berry and Linster had not yet confirmed the nature of King's injuries. But that distinction makes no difference, because an officer can know a condition is serious without a diagnosis. An officer is liable when he is aware of facts from which the need for medical care is obvious and he recognizes that need. *Farmer*, 511 U.S. at 842; *cf. Cooper v. Dyke*, 814 F.2d 941, 944–46 (4th Cir. 1987). The district court found that these officers heard King moaning, groaning, and laboring to breathe, suspected he had been beaten, and knew he needed medical attention. An officer who knows that much cannot escape *Estelle* merely because he couldn't yet catalogue the nature of the inmate's injuries.

Officers Berry and Linster advance three more arguments for why the right was not clearly established. All three depend on a version of the facts that the district court did not adopt, so none succeeds.

21

First, they argue that our decision in *Riley* demonstrates that the right at issue here was not clearly established. We disagree. If anything, *Riley* confirms our analysis here. There, an officer made supervisory rounds without looking inside the cells, and we held that he had not violated clearly established law "because there is no clearly established constitutional right to properly conducted security checks." 76 F.4th at 264–68. But the officer in *Riley* had heard nothing from the cells and had no reason to suspect that any particular inmate had been harmed; his fault lay only in failing to take the prophylactic steps that might have *revealed* an emergency. *Id.* at 266–68. Without clear precedent, a reasonable officer could have been uncertain about whether conducting rounds without peering into each cell was a constitutionally adequate response to the general risk of inmate violence. *Id.* at 265–66. Officers Berry and Linster stood in a different position. The district court found that they possessed concrete, contemporaneous, inmate-specific knowledge: They heard King moaning and groaning and suspected he had been assaulted. The duty to respond to a particular suspected emergency is not the same as the duty to conduct rounds carefully enough to discover emergencies in the first place. *Riley* concerned a failure to discover an emergency. This case concerns an intentional failure to respond to a suspected one.[12]

---

[12] *Moss v. Harwood* highlights this distinction. 19 F.4th 614, 624–25 (4th Cir. 2021). *Moss* recognized that delay can constitute deliberate indifference only if the gravity of the injury is apparent. *Id.* But in that case, nothing conveyed to the officers that immediate medical intervention was required, and there was no "record evidence" that the officers "subjectively appreciated any" substantial risk of serious harm. *Id.*; *see also Danser v. Stansberry*, 772 F.3d 340, 347–49 (4th Cir. 2014). In contrast, here, the district court made the opposite finding on both points: It found that the officers heard sounds of (Continued)

Second, the officers contend that no clearly established law required them to respond to labored breathing, which they perceived as suggestive of nothing more than a routine asthmatic episode. Appellants' Br. at 41–42; Reply Br. at 8–9. But the district court did not find that Officers Berry and Linster believed King was only having an asthma attack or that the sounds they heard were ambiguous. Rather, it found that they actually suspected an assault on the basis of the moaning and groaning that they heard through the intercom. To prevail on this argument, the officers would have us set aside this finding and credit instead their preferred characterization of their perceptions and suspicions. But—once again—that is precisely the kind of factual revision that interlocutory review of a qualified-immunity denial does not permit. *Johnson*, 515 U.S. at 319–20. Taking the facts as the district court found them, the answer is straightforward: An officer who hears an inmate moaning and groaning and thereby suspects that the inmate has just been violently assaulted has fair notice that deliberately deferring any response in order to avoid paperwork violates the inmate's constitutional rights.

Third, Officers Berry and Linster argue that they *did* respond—albeit slowly—and invoke *Koon*'s good-faith principle. 50 F.4th at 407. Once again, the officers' argument requires us to adopt a characterization of their conduct that the district court rejected. *Koon* protects officers who recognize a problem and take imperfect but genuine steps to address it. *Id.* The district court did not find that Officers Berry and Linster took such steps.

---

distress over the intercom *and* that they subjectively suspected that King had been assaulted. *King*, 2025 WL 487233, at *2–*3; *see also Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (indicating that an officer must be aware of a particularized risk to the specific inmate, not merely of a general risk to the unit).

Rather, it found that for some twenty minutes they did nothing while waiting out the round-punch interval in order to avoid a minor administrative inconvenience. The officers' later efforts—administering the inhaler, radioing for help, arranging transport, etc.—do not retroactively transform their prior deliberate inaction into a good-faith response. The good-faith principle protects officers who made *some* effort; the district court found that Officers Berry and Linster made *none* during the relevant period.

Because the district court's findings would permit a reasonable jury to conclude that Officers Berry and Linster violated King's clearly established constitutional right to be free from deliberate indifference to his serious medical needs, they are not entitled to qualified immunity at this stage.[13]

* * *

We dismiss the *Monell* and bond-statute appeals for lack of jurisdiction. On the § 1983 claim against Officers Berry and Linster for their twenty-minute delay in responding, we affirm. Officers who suspect an inmate has been beaten, hear him

---

[13] King also alleged that Officers Berry and Linster were deliberately indifferent by failing to look through the window of King's cell while performing rounds before they heard concerning sounds coming from King's cell. Berry passed King's cell twice during his 6:47 p.m. round without looking inside; Linster did the same during his rounds at 7:19 and 7:47 p.m. While perhaps relevant to King's other claims, this conduct cannot sustain a deliberate-indifference claim under the subjective standard. These rounds were deficient as a matter of jailhouse policy (which required visually observing inmates). But before Officers Berry and Linster heard the concerning noises, they had no reason to suspect that King had been assaulted. King had never reported threats. The assault occurred inside a closed cell, and nothing suggests officers saw suspicious activity in person or on video. An officer's failure to inspect, without evidence that the officer subjectively appreciated a risk of harm, does not satisfy the subjective prong. *See Riley*, 76 F.4th at 266 n.7.

struggling, and choose to delay checking on him—to avoid extra paperwork—are not entitled to qualified immunity.

*AFFIRMED IN PART,*
*DISMISSED IN PART*